UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **GEORGE F. SECHLER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:10-CV-5177** |
| | § | |
| **MODULAR SPACE CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

---

**MEMORANDUM AND ORDER**

---

Pending before the Court is a Motion for Summary Judgment filed by Defendant. After considering the motion, all responses thereto, and the applicable law, the Court finds that Defendant's motion must be GRANTED IN PART. The Court awaits briefing on the remainder of the motion.

## I.      BACKGROUND

This case relates to the allegedly unlawful termination of Plaintiff George Sechler ("Plaintiff" or "Sechler") by Defendant Modular Space Corporation ("Defendant" or ("ModSpace"). The facts provided herein are not in dispute unless otherwise noted.

Sechler battled alcohol dependence for many years before he was hired by ModSpace in 1998. He went to detox treatment in the Spring of 1994, and returned to work while attending outpatient treatment. (*Id.* at 68:16-69:2.) After several months of sobriety, Sechler relapsed in the fall of 1994. (*Id.* at 69:11-17.) He participated in inpatient treatment from November 1995 through April of 1996. (Sechler Aff. ¶ 3, Doc. No. 35-2.) Sechler was hired by GE Capital Modular Space on or about August 24, 1998,

1

for the position of "Fleet Manager." (Sechler Dep. at 65:1-7, Doc. No. 23-3.)  Sechler
began working at GE Capital Modular Space on August 24, 1998, and maintained
sobriety until about October of 2008. (Sechler Dep. at 65:4-5; 121:1-19.)

In the ten years that Sechler was sober, he excelled in his work. He was promoted
to the position of Branch Manager in 1999, and then to Assistant Director of Field
Operations for the Southwest Region in 2007. (*Id.* at 70:17-72:22.) In April 2007, GE
Capital Modular Space was acquired by Resun Leasing Incorporated ("Resun"), which
offered Sechler a position as Director of Field Operations. (*Id.* at 74:8-18; Resun Offer
Letter, Doc. No. 23-1-A.) Sechler was provided a retention bonus for his agreement to
remain with the company after it was acquired by Resun. (Doc. No. 35-3.) Around this
time, Sechler was selected as one of forty employees to receive an all expenses paid trip
to Jamaica and a "Team One Award" for extraordinary contributions to the company in
2007. (Doc. No. 35-6.) Sechler received an interim merit increase in August of 2008.
(Doc. No. 35-5.)

At some point thereafter, the corporate structure shifted again, and ModSpace was
formed. (Sechler Dep. at 79:9-80:1.) Sechler was offered a position with ModSpace on
October 7, 2008 as District General Manager. (*Id.* at 79:9-15; ModSpace Offer Letter,
Doc. No. 23-1-C.) In this role, Sechler managed ModSpace's offices in the South Texas
District, which included offices in Houston, Beaumont, Corpus Christi, and San Antonio.
(Sechler Dep. at 65:1-7.) Sechler was responsible for all sales and operational aspects of
his district; he reported directly to David Jones, the company's Regional Vice President,
who worked out of ModSpace's Chicago Office. (Dep. of David Jones, Doc. No. 23-4.)

Sechler was familiar with the company's employee policies, contained in its Employee Handbook. (Sechler Dep. at 101:16-25, 103:1-16.) The Handbook includes anti-discrimination policies, which provide that employees shall "be treated in all respects on the basis of their merit and qualifications and without regard to their race, creed, color, national origin, age, marital or family status, sex, sexual orientation, disability, veteran status, or any other characteristic protected by applicable law." (Anti-Discrimination Policy, Doc. No. 23-5.) The policy also provides that it is "intended to assure that its employees will not be treated differently on the basis of," among other factors, disability. (*Id.*)

Sechler was familiar with ModSpace's Drug-Free Workplace Policy ("Drug-Free Policy"). (Sechler Dep. at 102:5-7; Drug-Free Policy, Doc. No. 23-1-B.) The policy includes the following provisions:

- The Company will not hire anyone who is known to currently abuse Substances.
- Employees will not be terminated for voluntarily seeking assistance for a Substance abuse problem; however, performance, attendance, or behavioral problems may result in disciplinary actions up to and including termination.
- As of the effective date of this policy, at the discretion of the company management, "for cause" Drug and Alcohol Testing may be implemented . . . as a result of an unusual event, such as, but not limited to . . . strange or erratic behavior[,] . . . [r]eporting to work under the influence of Drugs of Alcohol[,] . . . [or] [r]eporting to work in a condition unfit to perform assigned duties.

(Drug-Free Policy, Doc. No. 23-1-B.) The policy lists disciplinary action, including termination, as a possible penalty and consequence of reporting to work under the influence. (*Id.*) It also indicates that a positive result on a "for cause" drug and alcohol test will result in immediate termination. (*Id.*)

3

After many years of sobriety, Sechler relapsed in 2008. Sechler explains that a number of factors contributed to his relapse. In March 2008, Sechler's wife passed away, leaving him as the sole caretaker of two young children, ages nine and ten. (*Id.* at 273:6-274:7.) In September 2007, Hurricane Ike hit the gulf coast of Texas, damaging Sechler's home. (*Id.* at 276:11-20.) Sechler was also responsible for managing ModSpace's response to Hurricane Ike for the Houston and Beaumont territories. (*Id.*) Sechler remarried in September 2008, and his new wife and stepchild moved into his home. (*Id.* at 276:11-15.) Finally, as noted above, the company restructured in 2008, and on October 7, 2008, Sechler was named to a newly created position, District General Manager of the South Texas Region, based in Houston. (*Id.* at 79:9-15, 276:15-16.)

Sechler began drinking again in October 2008 (Sechler Dep. at 121:1-19). His medical records indicate that, by Sechler's own estimates, he drank a pint and a half of vodka up to four days a week. (Doc. No. 26-6 at 4.) Notes from a medical assessment reflect that Sechler "reported he would drink all day," that that he would "leave work for lunch to grab a pint of vodka." (Doc. No. 26-7 at 12.) Medical reports also indicate that Sechler reported a "decrease in work performance." (*Id.*)

Jones, Sechler's supervisor, testified Sechler was "very open about his alcoholism and the fact that he did not drink." (Jones Dep. at 44:14-19.) For that reason, Jones was surprised when, at a meeting he attended with Sechler and other ModSpace employees in Tucson, he saw Sechler drinking wine with dinner. (*Id.* at 47:6-17.) Jones asked Sechler if Sechler felt it was appropriate for him to be drinking; Sechler responded that he had enough control of himself to be able to have one or two drinks. (*Id.* at 48:1-8.) In the Spring of 2009, Sechler attended a company-sponsored golf tournament. (Sechler Dep. at

126:18-21.) Sechler has expressed that he understood that, when he attended such functions, he was there as a representative of the company. (Sechler Dep. at 126:12-17.) Sechler admits to drinking from a bottle of vodka at that event. (Sechler Dep. at 128:7-12.)

Sechler attended another company-sponsored golf tournament in the spring of 2009. (Sechler Dep. at 129:16-130:6.) Sechler admits to drinking before that event, to which he brought his ten-year-old son. (*Id.* at 130:18-22.) While at the event, Sechler allowed his son to drive a golf cart; the golf cart was driven into trees, resulting in damage to the cart. (*Id.* at 131:10-133:8.) Sechler explains that he and his son were attempting to switch seats when the accident took place. (*Id.* at 132:7-133:4.)

In May 2009, Sechler participated in the "Tour du Rouge," a fundraiser that includes a seven-day bike ride from Houston to New Orleans. (*Id.* at 135:17-20.) ModSpace was the title sponsor for that event. (*Id.* at 137:12-16.) Sechler gave a speech on the opening night of the event, and was the designated "on call" representative from ModSpace for media interviews on the first day of the ride. (Doc. No. 23-1-D.)

Sechler withdrew from the ride after the first day; in an email to his colleagues, Sechler cited possible dehydration, including "chills," "sweats," and "other not so pleasant symptoms" as the reason for his withdrawal from the race. (Doc. No. 23-1-D.) Medical records reflect that Sechler reported that his last alcohol use was May 3, 2009 (the first day of the Tour du Rouge), and that he experienced "tremens [sic], anxiety, fatigue, low appetite, a [sic] diarrhea." (Doc. No. 26-7 at 12.) In his deposition, Sechler denied that consuming alcohol was the "direct cause" of his withdrawal from the race

(Sechler Dep. at 144:2-11); however, he did not deny making statements indicating that he had been drinking on May 3, 2009. (*Id.* at 143:18-22.)

Less than twelve hours after he sent the email to his colleagues explaining his withdrawal from the race, Sechler sent an email to Jones, Jones's supervisor, Keven Bremer, and Kim Prack, a Human Resources ("HR") representative. (Doc. No. 23-1-E.) Sechler stated as follows:

> Over the past several weeks, it has become obvious that I have been struggling, on the job and off the job. After 13 years of un-interrupted sobriety, I began to drink again. . . . I am requesting an EAP-employee assistance program to address the matter and get me back to the manager, father, husband, friend I have proven myself to be over the last 13 years (11 with ModSpace).

(*Id.*) Sechler asked to work with Kim Prack, rather than Amanda Grett, another HR representative. He explained that he had a strained relationship with Grett, and that her involvement would not be conducive to his recovery and his return to work. (*Id.*) Within two hours, Jones responded to Sechler's email as follows:

> Yes, you have all my support, and nothing but confidence in your ability to get through it and back on your feet. HR is aware and next steps will be very soon. I have arranged to be in Houston later morning tomorrow, with David Howry from HR. He is their [sic] to lend support as needed to the District team. I am not asking or want you to come into the office, imagining how difficult that may be. We'll touch base tomorrow. Hang in there. Support net is being deployed!

(Doc. No. 23-1-E.) On May 25, Jones flew to Houston. Sechler met with Jones and Howry at a restaurant near Sechler's home (Sechler Dep. at 153:3-18); at that meeting, Sechler's request to take a leave of absence to receive treatment for alcoholism was discussed and approved. (Jones Dep. at 166:17-167:18; Sechler Dep. at 154:14-155:12, 245:4-21.) However, Sechler testifies that, when he inquired about his ability to return to

the same position following his treatment, he was told that he "would have to fully cooperate with the process for there to be any change of employment following treatment." (Sechler Aff. ¶ 7.) He was also told that the company would be "evaluating the situation" during Sechler's time away. (*Id.*)

Jones and Howry advised Sechler that he would need to return his company car, and they made arrangements for another employee to pick up the car the following day. (Sechler Dep. at 153:19-154:7.) Sechler testifies that all of his responsibilities were immediately taken away, and that his company cell phone, computer, email, and internet access were all turned off. (Sechler Aff. ¶ 8.) Jones confirms that Sechler's "responsibilities as district general manager at that time were, in essence, put on hold with a focus and intent of getting better through the treatment process." (Jones Dep. at 171:16-24.)

On May 6, 2009, Sechler emailed Prack requesting that his company cell phone be turned back on, as the disrupted communication left a "void in my being able to have contact with children, support circle, and other contacts – like you." (Doc. No. 35-14 at 2.) Prack responded by apologizing for the confusion, and indicating that these services were "temporarily shut off" because Sechler was not to be working during his period of leave. (*Id.* at 1.) She indicated that Sechler should use a personal cell phone, and that he should call her if he needed anything. (*Id.*) Prack also indicated that ModSpace would pay Sechler for May 4 and 5, that "paid time off" would cover him from May 6 through May 12, and that short-term disability would kick in thereafter. (*Id.*) No one discussed the Family Medical Leave Act ("FMLA") with Sechler (Sechler Aff. ¶ 11), and the FMLA is not mentioned in the Employee Handbook.

7

Sechler attended outpatient treatment from May 7, 2009 until June 17, 2009 at the Cypress Creek Hospital ("Cypress Creek"). (Sechler Dep. at 217:13-218:1.) Treatment was covered by the behavioral health benefits provided by ModSpace's health care provider, Cigna. (Doc. No. 35-13.) Notes from a counselor at the Caron Foundation, where Sechler received a separate treatment months later, indicate that Sechler admitted to continuing to drink while receiving treatment at Cypress Creek. (Doc. No. 26-6 at 6.) In his deposition, Sechler denies drinking through his treatment at Cypress Creek, and indicates that the notation in his medical records that he made such a statement is incorrect. (Sechler Dep. at 228:17-230:22.)

On or about June 11, 2009, Amanda Grett was advised by another HR employee that Sechler was expected to complete outpatient treatment, and could return to work on June 18, 2009.  (Grett Decl. ¶ 8, Doc. No. 23-1.) Grett contacted Sechler on June 16, 2009, and advised him that he could return to work the following Monday, June 22, 2009. (*Id.*) Sechler's outpatient therapist advised ModSpace that Sechler was "scheduled to finish treatment with a successful completion on June 17, 2009," and that he had no restrictions when he returned to work, "just guidelines for his aftercare." (Doc. No. 35-18.)

On June 16, Grett emailed Sechler advising him that his return to work date was Monday, June 22, 2009, and that he was to report for a drug and alcohol screen. (Docs. No. 35-19, 35-20.) Sechler complied, and the screen results were negative for drugs or alcohol. (Grett Dep. at 219:18-24, Doc. No. 35-22.)

When Sechler returned to work on June 22, he had a meeting with Jones and Grett. (*Id.* ¶ 9.) Sechler was upset to learn that Grett, and not Kim Prack, would be the

HR representative working with him. (Sechler Aff. ¶ 14.) Sechler and Grett had a "strained," "antagonistic" relationship. (*Id.* ¶ 14.) Upon Sechler's return, Jones gave him a performance review that had been scheduled for late April, but that Jones had been unable to give at the scheduled time due to scheduling conflicts and Sechler's subsequent leave of absence. (*Id.*; Jones Dep. at 263:21-264:5.) An audit of ModSpace's Houston Branch apparently was undertaken during Sechler's leave, which ModSpace suggests yielded negative results, although the audit results themselves have not been disclosed. Sechler's performance review notes a number of deficiencies, including the following:

- "Improvement opportunities for dramatic improvement in productivity, improved cost management, and SFE measures, which are critical to District performance expectations;"
- "While George has developed a strong working knowledge of the operational side of the business . . . George needs to translate his knowledge into more action. There is significant improvement needed on cost side of the business that have not been managed successfully;"
- "The lack of supervision of employees has led to compliance concerns in multiple areas of the District operation that need to be addressed and corrected immediately;"
- "George's physical absence from the leadership role at the branch/district office in the past has put a strain on employees' understanding of their expectations;"
- "[O]rganization and planning is critical for success. It is evident through asset challenges, compliance violations, poor cost management, and broken processes that these skills have not been utilized;" and,
- "In numerous cases, George's communication can tend to be critical and damaging to a point of demotivating, which can alienate employees and demoralize the team. George's unprofessional behavior during functions, meetings, and conference calls with customers, vendors, employees, and management . . . is unacceptable."

(Performance Review, Doc. No. 23-1-F.) Notwithstanding the negative feedback, the review also comments that Sechler "took the lead in working with the Red Cross to establish a great opportunity for ModSpace," and that he "helped the business weather through the Hurricane recovery." (*Id.*) On a scale of one to four, with one being

"Outstanding" and four being "Needs Improvement," Sechler received an overall performance rating of four. (*Id.*)

During the June 22, 2009 meeting, Jones issued Sechler a Performance Improvement Plan/Warning ("PIP"). (Doc. No. 23-1-G.) The PIP informs Sechler that his "overall performance is not at a satisfactory level," and proceeds to detail specific areas of substandard performance. (*Id.*) Within those areas—which include "Operational Effectiveness;" "Asset Management;" "Contracts, Legal and Compliance;" "Sales Force Productivity;"     "EHS/Sourcing/Insurance/Billing/AP;"     General     Manager Responsibilities;" and "Professionalism"—the PIP provides examples of shortcomings and expectations for improvement. The parties dispute whether the requirements and expectations outlined in the PIP represent duties that were already encompassed within Sechler's District General Manager role. ModSpace contends that the duties listed in the PIP were already a part of that role, whereas Sechler maintains that the PIP added additional duties beyond what was expected of the position. Sechler points to the fact that, pursuant to the PIP, he was required to seek prior approval from his manager when requesting to work from home. (Doc. No. 23-1-G.) The PIP indicates that Sechler's professionalism is wanting, and specifies that Sechler was "not consistently present at work location and unavailable to District team on a consistent basis." (*Id.*) Jones has admitted that no other District General Manager who reported to him was required to seek prior approval to work from home. (Jones Dep. at 177:23 to 178:2, Doc. No. 35-10.)

During the same meeting, Grett provided Sechler with a "Return to Work" agreement (the "Agreement"), outlining the requirements with which Sechler had to comply as a condition of his return to work at ModSpace. (Grett Decl. ¶ 11; Return to

10

Work Agreement, Doc. No. 23-1-H.) The Agreement specified that Sechler was to attend weekly Alcoholics Anonymous ("AA") meetings and provide proof of attendance, as well as submit to at-will drug and alcohol screenings. (*Id.*) He was to be subject to such screenings within two hours of any request, and was required to produce clear results on any such test. (*Id.*) The Agreement indicated that a positive drug or alcohol screen would result in termination. (*Id.*) The Agreement also indicated that Sechler would not have access to a company vehicle through September 20, 2009, and would have to make other arrangements for transportation. (*Id.*) Sechler signed the Agreement on July 14, 2009, acknowledging that he read, understood, and accepted it. (*Id.*) Sechler requested permission to leave work to attend the required AA meetings, but was told by Grett that he should attend the meetings on his own time. (Sechler Aff. ¶ 19.)

On July 23, 2009, Grett sent Sechler a letter informing him that he was required to submit to an at-will drug and alcohol screen within two hours of receiving Grett's letter. (Doc. No. 35-26.) Sechler complied, and the drug and alcohol screen came back negative. (Grett Dep. at 219:18-24, Doc. No. 35-22.)

A few weeks later, on August 17, Sechler's coworkers reported that Sechler was exhibiting unusual behavior. ModSpace's District Operations Manager, Dean Torres, created a document titled "Summary/George Sechler August 17-18, 2009," which summarizes his observations of Sechler on August 17 and 18, 2009. Torres sent this document to Amanda Grett on August 19, 2009 via email. (Doc. No. 23-I-J.) In his summary of events, Torres indicates that he informed Jones on August 17 that he believed Sechler was impaired. (*Id.*) Grett confirms that, on August 17, 2009, Jones called her to let her know that he had received reports of inappropriate workplace

behavior by Sechler in which Sechler acted as though he was under the influence of alcohol. (Grett Decl. ¶ 12.) After receiving the call from Jones, Grett began an investigation into Sechler's conduct. She spoke with Torres, and also spoke with Mitch Hardwick, District Sales Manager, Jim Russell, Branch Operations Manager, and other managers or employees who witnessed Sechler's behavior on August 17. (*Id.* ¶ 13.) On August 18, Grett contacted Sechler to let him know that she was investigating allegations of inappropriate and unprofessional behavior, and that she wanted to "obtain his side of the story." (*Id.* ¶ 14.) According to Grett, Sechler commented that he "believed he was being 'thrown under the bus,'" and that his behavior on the 17th was attributable to post acute withdrawal syndrome, as opposed to alcohol use. (*Id.*)

On August 18, Hardwick sent Grett an email detailing his experiences with Sechler on the previous day. Hardwick's email notes that Sechler had slurred speech, and that Hardwick smelled alcohol on Sechler's breath. (Doc. No. 23-1-I.) Russell, a longtime personal friend of Sechler's, sent an email to Grett on August 20 indicating that he believed Sechler had been drinking on the 17th. Russell's email describes Sechler as unable to stay focused, and louder than normal. (Doc. No. 23-1-K.) It states that Russell has been around Sechler when Sechler has had too much to drink, and that "that was the first thing that went through" Russell's head. (*Id.*) Russell also indicates that, at one point that day, he saw Sechler go to the passenger side of his truck and take a drink of something. (*Id.*)

On August 18, Grett received a call from Hardwick and Torres, who informed her that Sechler again was behaving as if he was under the influence of alcohol. (Grett Decl. at ¶ 15.) In Torres' email summary of the events on August 17 and 18, he indicates that

12

Sechler looked, on August 18, as though he had been drinking, up all night, or both. (Doc. No. 23-1-J.) Torres also notes that, at approximately 2:30 p.m., he saw Sechler holding a bottle in a brown paper bag near his mouth, and then placing the bottle back under the seat or in the floorboard of his car. (*Id.*) Hardwick's account of August 18 is similar. He explains that Sechler's behavior gradually got worse throughout the day. (Doc. No. 23-1-I.) Hardwick indicates that, around 2 p.m., Sechler came into Hardwick's office indicating that he knew Hardwick had thrown him under the bus and that he was getting fired. (*Id.*)

Upon receiving reports about Sechler's unusual behavior, Grett contacted Sean McManus, ModSpace's Chief HR Officer, and the decision was made to send Sechler to a drug and alcohol screen. (Grett Decl. ¶ 15.) Grett contacted Sechler to notify him of the screening, and informed him that he would need to be driven by someone else, as ModSpace was concerned for his safety and the safety of others. (*Id.* ¶ 16.) Sechler refused, and indicated that he would only go to the screening if he could drive himself. (*Id.*) Thereafter, Grett and McManus spoke to Sechler together. (*Id.* ¶ 17.) Grett indicates that, during this conversation, Sechler "slurred his speech and sounded incoherent." (*Id.*) McManus informed Sechler that he was required to submit to the test, and that he would need to be driven; he explained that if Sechler did not comply with this request, his employment would be terminated. (*Id.*) Sechler still refused to be tested unless he was able to drive himself. (*Id.*) The call ended when Sechler hung up on Grett and McManus. (*Id.*)

Grett and McManus tried to reach out to Sechler again on his office phone and work cell phone, but he did not answer. (*Id.* ¶ 18.) He also refused to speak with Grett

13

and McManus when others notified him that Grett and McManus wished to speak with him. (*Id.*) Grett and McManus therefore proceeded to communicate with Sechler through Hardwick and Torres, the managers located at Sechler's branch. (*Id.*) Hardwick, Torres, and Russell tried to convince Sechler to get tested, but he refused. (Doc. Nos. 23-1-I; Doc. No. 23-1-J; Doc. No. 23-1-K.) McManus then offered to pay for a taxi to take Sechler to the testing facility, which Sechler also refused. (Grett Decl. ¶ 19; McManus Decl. ¶ 6, Doc. No. 23-2.) Because Sechler refused to allow someone to drive him to the facility, he could not produce a complying test result, and McManus made the decision to terminate his employment. (*Id.* ¶ 7.)[1] Sechler would not communicate with McManus, so Hardwick had to inform Sechler that his employment had been terminated. (*Id.*) Grett has testified that, "[a]t the end of the day George Sechler[] . . . wasn't terminated because of this investigation or because of these concerns. It [sic] was terminated because he refused to take a drug and alcohol screen." (Grett Dep. at 252:16-255:8.)

After Sechler was terminated, Hardwick, Torres, and Russell offered to drive him home. (Doc. Nos. 23-1-I; Doc. No. 23-1-J; Doc. No. 23-1-K.) After multiple requests, Sechler finally agreed to let Russell drive him home in Sechler's car. (*Id.*) On the way to the parking lot, Sechler told Russell that he was going to get drunk on the way home. (Doc. No. 23-1-K.) Russell offered to stop somewhere to allow Sechler to buy alcohol, but Sechler indicated that he had alcohol in his vehicle, and that he had been drinking all day. (*Id.*) Sechler then removed a bottle wrapped in a brown paper bag from the

---

[1] Grett testified that she has ordered for-cause testing approximately seven to ten times and that, when testing was based on a reasonable suspicion that the employee was under the influence of drugs or alcohol, the employee was required to have someone else drive him to the testing facility. (Grett Dep. at 329:6-12.) She explained that the purpose of this requirement is to ensure the safety of the employee and others. (*Id.*)

14

passenger side of the car, identified the bottle as vodka, and proceeded to drink from it. (*Id.*)

On October 7, 2009, Sechler filed a Charge of Discrimination with the EEOC, alleging violations of the Americans with Disabilities Act of 1991, as amended (the "ADA"). On December 23, 2010, Sechler filed his Complaint in this Court. (Doc. No. 1.) On February 28, 2011, he filed his First Amended Complaint (the "Complaint"). (Doc. No. 4.) In his Complaint, Sechler alleges that he has a disability within the meaning of the ADA, 42 U.S.C. §§ 12102, 12111(8), and the ADA Amendments Act of 2008 (the "ADAAA"). He asserts claims for discrimination and failure to accommodate under the ADA, and also alleges violations of the FMLA, 28 U.S.C. § 2611.[2] ModSpace moves for summary judgment on all of Sechler's claims.

## II.     LEGAL STANDARD

In order to grant a motion for summary judgment, a court must find that the pleadings and evidence show that no genuine issue of material fact exists, and that the movant therefore is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted) (citation omitted). If the moving party meets this burden, the

---

[2] Sechler also brought a claim under the Rehabilitation Act of 1963; however, in his Response to Defendant's Motion for Summary Judgment (Doc. No. 35), Sechler voluntarily abandoned this claim.

nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.*

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Servs., LLC*, 341 Fed. App'x 26, 28 (5th Cir. 2009) (citation omitted). The Court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075.

### III.   ANALYSIS

#### A.  ADA Claims

Sechler brings claims under the ADA for discrimination and for failure to accommodate.

#### 1.  Discrimination

The ADA prohibits discrimination by private employers against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). The current version of the ADA incorporates the ADA Amendments Act of 2008 (the "ADAAA"). 42 U.S.C. § 12102(4)(A). Because the events at issue in this case occurred after January 1, 2009, the effective date of the ADAAA, the Court looks to post-amendment language in considering Sechler's claims.

16

ADA claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Pursuant to this framework, in order to prevail on a discrimination claim under the ADAAA, a plaintiff first must establish a prima facie case by showing (1) that he is disabled; (2) that he was qualified for the position; (3) that an adverse employment action was taken against him; and (4) that he was replaced by or treated less favorably than non-disabled employees. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003.) If a plaintiff sets forth a prima facie case, then a rebuttable presumption of discrimination arises. *Id.* To rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* The employer satisfies its burden if it produces evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse employment action. *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

If the employer produces such evidence, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is merely a pretext for discrimination. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). Once the burden shifts back to the plaintiff, the question is whether the employer had a discriminatory motive in making its decision to terminate the plaintiff. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995). ModSpace urges that Sechler cannot set forth a prima facie case of disability discrimination because he does not meet the definition of disabled under the ADA, and he cannot show that he was replaced by or treated less favorably than non-disabled employees. ModSpace also maintains that, even if the Court were to find that Sechler presents a prima facie case of disability discrimination, ModSpace has a

17

legitimate, nondiscriminatory reason for terminating Sechler's employment, and no evidence of pretext exists.

### a.  Prima facie case

### i.  Disability

The ADA defines the term "disability" in three, alternative ways. It is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADAAA expanded the definition of "major life activities" to "caring for oneself, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 122 Stat. 3553, sec. 3 § 2(A). The limitation that the impairment places on a major life activity must be "substantial." To be substantial, an impairment must limit the ability of an individual to perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii); *see also Holland v. Shinseki*, 2012 WL 162333, *6 (N.D. Tex. Jan. 18, 2012). This standard is to be "construed broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i).

Thus, in order to prove the existence of a disability under the first prong of 42 U.S.C. § 12102(1), a plaintiff must offer evidence that an impairment substantially limits the plaintiff's ability to perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). To prove the existence of a disability under the second prong, a plaintiff seeking to show a record of impairment must show "a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population." 29 C.F.R. § 1630.2(k). The third

18

prong of 42 U.S.C. § 12102(1) requires proof that a plaintiff was regarded as having a physical or mental impairment that substantially limits one or more major life activities.

Sechler offers his own testimony to prove the existence of a disability under the first prong. He states, "After my return to work, I had trouble thinking, concentrating, and communicating and interacting with others." (Sechler Aff. ¶ 24.) ModSpace challenges Sechler's evidence on the basis that it does not prove how his ability to think, concentrate, communicate, and interact with others was diminished or limited as compared to most people in the general population. *See Holland*, 2012 WL 162333, at *6, n.5 (finding that plaintiff had not provided any summary judgment evidence regarding how her alleged loss of concentration was diminished as compared to that of an average person).

Notwithstanding the absence of explicit testimony distinguishing Sechler's difficulties from those of the general population, the Court finds the testimony that Sechler had difficulty thinking, concentrating, communicating, and interacting to be sufficient. "Thinking," "concentrating," and "communicating" are all included in the ADAAA's definition of major life activities. 122 Stat. 3553, sec. 3 § 2(A). The post-ADAAA regulations make clear that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(v). The regulations also provide that, after the passage of the ADAAA, the consideration of the "substantially limits" prong is not the primary object of attention in ADA cases, and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(iii). In light of the "substantially limits" standard created by the ADAAA, the

Court thinks it appropriate to read Sechler's testimony as giving rise to a genuine issue of material fact as to whether his difficulties thinking, concentrating, and communicating are unique, and unlike those experienced by the general population. Thus, the Court finds that the evidence creates a factual question about whether Sechler has a disability under the ADA.

### ii. Replacement by or less favorable treatment than non-disabled employees

A new District General Manager, Tim Swift, was hired to replace Sechler. (Grett Dep. at 121:23-122:13.) According to Grett, Swift had no substance abuse issues or other disabilities of which she was aware. (*Id.*) ModSpace has offered no evidence to contradict this testimony, and the Court finds it sufficient to give rise to a question as to whether Sechler was replaced by a non-disabled employee.

### b. Legitimate, nondiscriminatory reason

Although genuine issues of material fact remain as to whether Sechler was disabled and replaced by someone not disabled, ModSpace has come forward with a legitimate, nondiscriminatory reason for its decision to terminate Sechler's employment. Specifically, the evidence indicates that Sechler was behaving oddly while at work, and, according to comments he later made to Russell, was likely under the influence of alcohol the day he was terminated. Based on reports of his strange behavior, Grett and McManus decided to send Sechler for a drug and alcohol screen in accordance with his Return to Work Agreement. Sechler refused to comply with that request by allowing either another employee or a taxi to drive him to the testing facility. Sechler therefore violated his Return to Work Agreement, which gave ModSpace a legitimate,

nondiscriminatory reason to fire him. *See McKey v. Occidental Chem. Corp.*, 956 F. Supp. 1313, 1318-19 (S.D. Tex. 1997) (plaintiff's violation of a return to work agreement, which required plaintiff to abstain from mood altering chemicals, provided a legitimate basis for termination); *Williams v. Houston Lighting & Power Co.*, 980 F. Supp. 879, 884 (S.D. Tex. 1997) (violation of a return to work agreement was a legitimate, nondiscriminatory reason for termination); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1182 (6th Cir. 1997) (same). Sechler's conduct also violated ModSpace's Drug-Free Policy, which requires employees to submit to for-cause testing. ModSpace has presented a legitimate, nondiscriminatory reason for terminating Sechler.

### c. Pretext

Because ModSpace has shown a legitimate, nondiscriminatory reason for Sechler's termination, the burden shifts back to Sechler to present evidence that ModSpace's reason is false, and that the adverse action taken by ModSpace was actually motivated by Sechler's disability. *Mayberry*, 55 F.3d at 1090; *St. John*, 537 F. Supp. 2d at 858.

Sechler contends that the short period of time between his treatment for alcoholism and the adverse employment action is sufficient to meet this burden. He relies on *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999), which recognizes that temporal proximity is relevant, and holds that where such proximity is shown, the employer must offer a legitimate, nondiscriminatory reason that explains both the adverse action and its timing. *Id.* Here, ModSpace has offered both a legitimate, nondiscriminatory reason for terminating Sechler, and a reason for the timing of the termination. That is, ModSpace offers evidence that it terminated Sechler on the same

day that he violated his Return to Work Agreement by refusing to submit to drug and alcohol testing.

Sechler's second argument is that the existence of a Return to Work Agreement itself evidences pretext. However, as discussed above, courts in this District have recognized that such agreements are valid requirements for employment. *Williams*, 980 F. Supp. at 884; *McKey*, 956 F. Supp. at 1319. Of course, such an agreement would not be valid if other evidence showed that the agreement itself was pretextual. However, the existence of such an agreement, without more, does not prove pretext, and there is no evidence in this case to indicate that the Agreement was pretextual.

Sechler's third argument is that ModSpace failed to comply with its own discipline and drug-free workplace policies, and that such a failure to comply with internal policies evidences pretext. *Machinchick v. B.P. Power, Inc*. 398 F. 3d 345, 354-55 & n. 20 (5th Cir. 2005). ModSpace's Employee Handbook provides as follows:

> Disciplinary action may include any one or more of the following steps:
> - Oral warnings and reprimands
> - Written reprimands
> - Written notice of performance deficiencies
> - Performance Improvement Plan (PIP)
> - Suspension
> - Reduction in pay
> - Demotion
> - Discharge

(Doc. No. 35-30-2 at 30.) The handbook also explains that, "with respect to most disciplinary problems, these steps will normally be followed: a first offense may call for a verbal warning; a next offense may be followed by a written warning; another offense may lead to suspension; and, still another offense may lead to termination of employment." (*Id.*) However, the policy provides that "certain types of employee

problems are serious enough to justify, for example, suspension, demotion, or termination of employment, without going through the usual progressive discipline steps." (*Id.*) Because this policy provides that disciplinary action may include any one of the eight enumerated steps, and does not require that less serious steps be taken before the more severe ones, Sechler fails to show how ModSpace failed to comply with its policy. He likewise fails to show non-compliance with the company's Drug-Free Policy, which provides that "any employee who refuses to participate in a pre-access, random, annual, or 'for cause' Drug/Alcohol Test will have his or her employment immediately terminated." (Doc. No. 23-1-B.) Sechler refused to participate in a for cause test, and his employment was immediately terminated.

Next, Sechler contends that ModSpace relied on "incompetent evidence" in demanding that Sechler take a drug and alcohol test. (Doc. No. 35 at 28.) However, Sechler fails to cite evidence in support of this conclusory contention. Indeed, the evidence shows that Grett received reports on August 18, 2009, from Hardwick and Torres that Sechler was behaving abnormally. (Grett Dep. at 328:17-22.) Torres also informed Grett that he could smell alcohol on Sechler's breath. (*Id.*) In addition, Grett spoke to Sechler on the phone multiple times on August 18, and observed "slurred speech and incoherent" behavior by Sechler. (*Id.* at 329:2-5.) This evidence indicates that it was reasonable for Grett to ask Sechler to submit to a for-cause drug and alcohol screen. Sechler's belief that this testimonial evidence "was fabricated to cover [t]he unwarranted and illegal demand that Sechler submit to a drug and alcohol screen" is unsupported, and cannot give rise to a genuine issue of material fact. (Doc. No. 35 at 29.)

23

Finally, Sechler contends that ModSpace has offered conflicting reasons for terminating him. Inconsistent explanations for employment decisions can permit an inference of pretext. *Gee v. Principi*, 289 F. 3d, 342, 347-48 (5th Cir. 2002). However, the evidence in this case does not support Sechler's allegation of inconsistent explanations. Grett has testified that Sechler was terminated because he refused to take a drug and alcohol screen. (Grett Dep. at 240:18-241:9.) ModSpace informed the EEOC that Sechler was terminated for misconduct because he violated the terms of his "Last Chance" employment letter. (Doc. No. 35-32 at 167-72.) These reasons are not inconsistent: ModSpace contends that it fired Sechler because he did not comply with a specific term of the agreement associated with his return to work, namely, submitting to a drug and alcohol screen when such a request was made. That Sechler agreed to take the test with a limitation—only if he could drive himself—is insufficient to show compliance. Such a conclusion would require ModSpace to have sent an apparently intoxicated employee to drive himself to a drug and alcohol screen, putting both that employee and the public at risk. ModSpace's requirement that Sechler not drive himself was eminently reasonable, and ModSpace is entitled to summary judgment on Sechler's ADA discrimination claim.

### 2. Failure to accommodate

In addition to claiming discrimination under the ADA, Sechler also claims that ModSpace failed to reasonably accommodate him. The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless doing so "would impose an undue hardship" to the employer. 42 U.S.C. §

12112(b)(5)(A). A plaintiff claiming that his employer failed to make reasonable accommodations must demonstrate, as part of his prima facie case, that an accommodation of his disability exists and that such accommodation is reasonable. *See Riel v. Electronic Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). The term "reasonable accommodation" may include making existing facilities used by employees readily accessible and usable by individuals with disabilities and granting part-time or modified work schedules. *Id.* § 12111(9). The employer's obligation to provide a reasonable accommodation is triggered by the employee's request for an accommodation. *See Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (citing the ADA's implementing regulations).

An ADA plaintiff must exhaust administrative remedies before commencing an action in federal court. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th Cir. 1996). The failure to exhaust remedies will result in dismissal of a plaintiff's claims on the merits. *Id.* In this respect, an ADA action is limited to the scope of the plaintiff's administrative charge and to the EEOC investigation that can reasonably be expected to grow out of the charge of discrimination. *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006).

ModSpace first asserts that Sechler's failure to accommodate claim is barred as a matter of law, as he did not raise this claim in his EEOC charge. Although Sechler's failure to accommodate claim is not entirely clear, he appears to be asserting that he made the following requests for accommodations: (1) he requested assistance through the Employee Assistance Program ("EAP"); (2) he requested confidential assistance in

addressing his disability; (3) he requested to work with Kim Prack in HR, rather than Amanda Grett; (4) he requested to work from home on occasion without prior approval; and (5) he requested use of the company vehicle or reimbursement for his commute.

ModSpace contends that Sechler failed to allege, in his EEOC charge, that he requested an accommodation or that ModSpace failed to respond to such a request. Instead, ModSpace urges, his EEOC complaint alleged only discrimination. The Court agrees that the focus of Sechler's EEOC charge was his discrimination claim, but it does appear that Sechler made one reference out of which an investigation into failure to accommodate reasonably could be expected to grow. Specifically, Sechler's EEOC charge indicates that he "attempted to obtain confidential assistance through the company's Employee Assistance Program." (Doc. No. 35-32 at 4.) Elsewhere in the EEOC questionnaire he responds to a question about whether he asked his employer "for any assistance or change in working condition because of your disability." (Doc. No. 35-31.) Sechler checked the box for "yes," indicating that, on May 4, 2009, he requested EAP to get treatment. These two references suggest that Sechler did exhaust his failure to accommodate claim specifically as to ModSpace's failure to provide assistance through EAP. Sechler cannot be said to have administratively exhausted any of the other bases of his failure to accommodate claim. There is no reason that Sechler's EEOC complaint would have let to investigation into his request to work with Kim Prack, his request to work from home without prior approval, or his requested used of the company vehicle (or reimbursement for his commute) as requested accommodations.[3]

---

[3] If the Court were to consider these purported accommodation requests on the merits, it would have to consider whether these requests were, in fact, requests for accommodations related to Sechler's disability. For example, according to Sechler's own allegations, other employees were allowed to work from home

As to the one arguably exhausted request for accommodation—Sechler's request to take time off of work to get treatment—Sechler admits in his EEOC charge that this request was granted (Doc. No. 35-32 at 4), and there is no dispute that Sechler did receive the time off that he requested. Sechler points to evidence suggesting that ModSpace did not provide complete confidentiality in accommodating his request for time off. (Jones Dep. at 62:8-63:25.) However, Jones' testimony actually demonstrates that, although ModSpace employees contacted Jones to ask whether Sechler's leave was alcohol-related, Jones refused to discuss the matter with them beyond explaining that Sechler was taking a leave of absence for personal reasons. (*Id.* at 62:8-64:19.) Thus, in suggesting that Jones has admitted to telling employees that Sechler took an alcohol-related leave, Sechler mischaracterizes the evidence in this case. Ultimately, the Court finds no support for the contention that ModSpace failed to provide the confidential assistance in obtaining time off for treatment that Sechler requested.[4] Thus, Sechler cannot proceed on a claim based on ModSpace's failure to accommodate, and summary judgment must be granted in favor of ModSpace as to this claim.

### B. FMLA Claim

---

without prior approval. The requirement for prior approval was imposed upon Sechler pursuant to the PIP. Thus, his request to work from home without prior approval does not appear to be a request for an accommodation based on or in any way related to his disability; rather, Sechler wanted to be treated as other employees who were not on a PIP. Whether such a request fits within the parameters of the ADA at all is less than clear.

[4] Although the evidence indicates that ModSpace no longer utilized an EAP program, ModSpace nonetheless provided the leave requested by Sechler. Sechler urges that "[e]ven if the EAP were no longer available, ModSpace could have handled it much more like and [sic] EAP." (Doc. No. 47 at 15.) It is not clear how else ModSpace could have done so, or how its provision of the requested leave was in any way unreasonable. Sechler's argument is especially unpersuasive in light of his own statement that, "I requested EAP to address my disability . . . . *My request was granted* and I went on a leave of absence from May 6th, 2009 to June 20th, 2009." (Doc. No. 35-32 (emphasis added).)

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA protects employees from interference with their leave, and from discrimination or retaliation for exercising their rights. 29 U.S.C. §§ 2615(a)(1)-(2). Sechler brings a claim under the FMLA on both bases, alleging that ModSpace both denied him the right to take leave under the FMLA (Sechler's "FMLA Entitlement" claim), and that it terminated his employment for taking leave, in violation of the FMLA (Sechler's "FMLA Discrimination/Retaliation" claim).[5]

### 1.  FMLA Entitlement

To prevail on a cause of action for interference with FMLA rights, an employee must prove both that the employer interfered with, restrained, or denied his or her exercise of FMLA rights, and also that the employee was prejudiced by this violation. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Interference with FMLA rights can include "for example, not only refusing to authorize FMLA leave, but

---

[5] Until April 17, 2012, when ModSpace filed a Motion for Leave to Supplement its Motion for Summary Judgment (Doc. No. 56), the Court was under the impression that no dispute existed as to Sechler's qualification as an "eligible employee." Under the FMLA, an employee is not an "eligible employee" if he is "employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B). The determination of whether an employee is "eligible" under the FMLA is made at the time the employee requests leave. 29 C.F.R. § 825.110(e). Although ModSpace failed to challenge Sechler's status as an eligible employee in its Motion for Summary Judgment, it seeks to do so now through supplemental briefing. ModSpace contends that, at the time Sechler requested leave, ModSpace employed fewer than fifty employees within seventy-five miles of Sechler's worksite. Because this issue goes to an element of Sechler's statutory claim, the Court feels compelled to allow ModSpace to raise it, even at this late stage. The Court is awaiting Sechler's response to this new information. However, as trial is rapidly approaching, the Court thinks it prudent to rule on the remainder of the FMLA issues, assuming that the statute does apply. Of course, once the "eligible employee" question is fully briefed, the Court can reexamine Sechler's remaining FMLA claim.

discouraging an employee from using such leave" or "manipulation by a covered employer to avoid responsibilities under the FMLA." 29 C.F.R. § 825.220.

### a.  Interference

To prove interference under the FMLA, Sechler must show that he gave notice to ModSpace of his intent to take leave and that he was denied an entitlement under the FMLA. 29 C.F.R. § 825.302(c) (an employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave"). Sechler emphasizes the fact that he need not have requested FMLA leave by name in order to be entitled to it. 29 CFR § 825.301(b). Instead, an employee must explain only enough to alert his employer that he wishes to take qualified FMLA leave. 29 C.F.R. § 825.301(b). Sechler's May 4, 2009 email requesting leave, he contends, was sufficient to trigger ModSpace's responsibilities under the FMLA. The Court agrees that at least a genuine issue of material fact remains regarding whether Sechler provided sufficient notice of his entitlement to FMLA leave.

Sechler argues that ModSpace interfered with his leave by failing to provide notice required under the FMLA. ModSpace first contends that Sechler cannot bring such a notice claim, as it was not included in his Complaint. Sechler's FMLA allegation in his First Amended Original Complaint consists of the following sentence: "Defendant[] intentionally denied Plaintiff the exercise of his rights provided under the FMLA by setting up Plaintiff so that it did not have to grant him further leave and then terminating him in retaliation for taking time off in violation of the FMLA." (Pl. Compl. ¶ 66.) The Court finds that the allegation that ModSpace "set up" Sechler so that it did not have to grant him further leave encompasses the evidence Sechler now submits about

ModSpace's failure to provide notice. Though no specific reference was made to failure to provide notice, the Court finds the factual allegation in the Complaint sufficient. Thus, this claim is properly before the Court.

As to notice, the FMLA sets out a list of requirements, detailing employers' responsibilities for alerting employees of their FMLA rights. Sechler alleges, albeit at times unclearly and indirectly, that ModSpace may have violated a number of these requirements. First, the regulations require employers to provide "general notice" of the FMLA, "explaining the Act's provisions and providing information concerning procedures for filing complaints of violations of the Act." 29 C.F.R. § 825.300(a)(1). FMLA-covered employers with eligible employees must "provide this general notice to each employee by including the notice in employee handbooks or other written guidance . . . or by distributing a copy of the general notice to each new employee upon hiring." *Id.* § 825.300(a)(3). ModSpace's Employee Handbook does not contain notice of the FMLA, and there is no evidence that ModSpace provided any other notice to Sechler. However, Sechler has not submitted any evidence that ModSpace did not provide FMLA notice in some other document, and therefore has not presented sufficient summary judgment evidence on this point.

The FMLA also requires that, "[w]hen an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). This notice "must state whether the employee is eligible for FMLA leave;" if the employee is not eligible, the notice "must state at least one reason

30

why the employee is not eligible." *Id.* § 825.300(b)(2). The notice may be given orally or in writing. *Id.* ModSpace does not contend, and there is no evidence to suggest, that Sechler was given such notice. Indeed, Sechler has testified that no one discussed the FMLA with him. (Sechler Aff. ¶ 11).

Finally, the regulations provide that an employer is responsible for designating an employee's leave as "FMLA-qualifying, and for giving notice of the designation to the employee." *Id.* § 825.300(d)(1). ModSpace does not contend, and there is no evidence to suggest, that it designated Sechler's leave as FMLA-qualifying. A genuine issue of material fact remains as to ModSpace's compliance with the FMLA's notice requirements.

### b. Prejudice

Even if Sechler can prove that ModSpace did not provide the statutorily required notice, he also must show a real impairment of his rights, and resulting prejudice, to prevail on a prescriptive entitlement claim. *Ragsdale v. Wolverine World Wide Inc.*, 535 U.S. 81, 90 (2002). Moreover, an employee who has received all of the entitlements which would be available under the FMLA does not have an FMLA claim, regardless of the quality of notice, or even a lack of notice. *Downey v. Strain*, 510 F.3d 534, 542 (5th Cir. 2008). ModSpace contends that, because Sechler was given the leave he requested, he was not prejudiced by ModSpace's failure to provide statutory notice. Sechler responds that he did not receive all available entitlements under the FMLA, and that, had he received notice, he would have taken advantage of such entitlements.

In *Ragsdale v. Wolverine*, the Supreme Court noted that the FMLA cause of action "permit[s] a court to inquire into matters such as whether the employee would

have exercised his or her FMLA rights in the absence of the employer's actions." 535 U.S. at 91. The Supreme Court further explains that, "[t]o determine whether damages and equitable relief are appropriate under the FMLA, the judge or jury must ask what steps the employee would have taken had circumstances been different." 535 U.S. at 91. Sechler submits a supplemental affidavit outlining the steps that he would have taken had circumstances been different—that is, had he known about his rights under the FMLA. He testifies that, had he known about FMLA leave, he would have participated in the aftercare program recommended by Cypress Creek, which would have taken about four hours of his time each week. (Sechler Supp. Aff. ¶ 12, Apr. 4, 2012, Doc. No. 50-2.) According to Sechler, he did not believe he was entitled to take this further time off. (*Id.*) Sechler's belief that ModSpace would not allow him to take further time off was reasonable, in light of the fact that his request to attend the mandatory AA meetings during work hours was denied. (Sechler Aff. ¶ 19.) Sechler testifies that his participation in Cypress Creek's aftercare program "would have made a difference" in whether he relapsed. (*Id.*)

Sechler also explains that, had he known about his options, including the FMLA, he would have used his accrued paid time off, rather than taking leave on a reduced salary and using short term disability. (*Id.* ¶¶ 10-11.) He also indicates that, had he known that reduced leave was a possibility, he would have "taken a reduced leave schedule." (*Id.* ¶ 10.) In *Ragsdale*, the Supreme Court considered a situation in which an employee undergoing cancer treatments every other week for twelve weeks might want to return to work during her off weeks. 535 U.S. at 89. "If she is not informed that her absence qualifies as FMLA leave—and if she does not know of her right under the statute to take

32

intermittent leave—she might take all 12 of her FMLA-guaranteed weeks consecutively and have no leave remaining for some future emergency." *Id.* at 89-90. The Supreme Court recognized that it "may be reasonable" to consider an employer's failure to give the required notice in such a situation to "'interfere with' the employee's exercise of her right to take intermittent leave." *Id.*

Applying the reasoning in *Ragsdale*, and in light of Sechler's supplemental affidavit, the Court concludes that sufficient evidence exists to create a fact question as to whether ModSpace's failure to provide the required notice impaired Sechler's rights and resulted in prejudice to him. Further, because Sechler did not receive all of the entitlements that would have been available to him under the FMLA, his claim is not precluded on that basis. Thus, if Sechler is found to be an "eligible employee," ModSpace's motion for summary judgment will be denied as to his FMLA Entitlement claim. The Court awaits further briefing on the question of Sechler's status as an "eligible employee."

## 2.   FMLA Discrimination/Retaliation

Sechler also alleges discrimination and retaliation under the FMLA. To establish a prima facie case for discrimination or retaliation under the FMLA, an employee must prove that: (1) he was protected under the FMLA; (2) he suffered an adverse employment action; and either (3)(a) he was treated less favorably than an employee who did not request FMLA leave, or (3)(b) the adverse decision was made because of his request for leave. *Hunt v. Rapides Healthcare Sys.*, 277 F.3d 757, 768 (5th Cir. 2001). If the employee succeeds in establishing a prima facie case, the burden shifts to the employer to provide a legitimate, nondiscriminatory or non-retaliatory reason for the adverse action.

33

*Id.* If the employer articulates such a reason, the employee must show, by a preponderance of the evidence, that the employer's reason is a pretext for discrimination or retaliation. *Id.*; *see also Comeaux-Bisor v. YMCA of Greater Houston*, 290 Fed. App'x 722, 724-25 (5th Cir. 2008) (citing *Bocalbos v. Nat'l Western Life Ins. Co.*, 162 F.3d 379, 384 (5th Cir. 1998)). ModSpace does not dispute that Sechler suffered an adverse employment action when he was terminated, and, for the limited purpose of considering Sechler's FMLA Discrimination/Retaliation claim, the Court will assume that Sechler was protected under the FMLA. However, ModSpace argues that Sechler cannot meet the third element of his prima facie case because his termination was unrelated to his request for FMLA leave.

### a.  Prima Facie Case

To prove a connection between his FMLA leave and his termination, Sechler points first to the temporal proximity between the two. This Court has recognized before that an employee's termination shortly after taking FMLA leave "demonstrates a causal connection between taking the leave and being fired." *Salinas v. Exxon Mobil Corp.*, 2005 WL 2122065, at *4 (S.D. Tex. Aug. 31, 2005). However, temporal proximity between a protected activity and an adverse employment action, without more, is usually insufficient to evidence causation unless the proximity is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). In this case, approximately two months passed between Sechler's return to work and his termination. More than three months passed between his request for leave and his termination. Temporally, then, these two events were not "very close." Moreover, the evidence establishes that a key intervening event took place between Sechler's return from leave and his termination—that is,

34

Sechler refused to submit to a drug and alcohol screen, in violation of his Return to Work Agreement. The relevance of temporal proximity surely is minimized by the occurrence of an intervening event that provides a valid basis for termination.

Second, Sechler urges that ModSpace used his taking of FMLA leave as a negative factor in his performance review. An employer's expressions of concern regarding an employee's absence have been found sufficient to establish retaliatory causation. *McCardle v. Dell Prods., LP*, 293 Fed. App'x 331, 338 (5th Cir. 2008), and the performance review that ModSpace gave Sechler upon his return from leave included comments about his absence from work. However, the review states that it covers the period of October 1, 2007 to December 31, 2008. (Doc. No. 23-1-F.) There is no evidence to suggest that the review in any way relates to Sechler's leave in May and June of 2009. (*Id.*) An employer's expression of concern about an employee's past absences, if those absences are unrelated to FMLA leave, cannot establish causation. Thus, Sechler has failed to present a prima facie case.

### b. Legitimate, nondiscriminatory or non-retaliatory reason

Even if Sechler could present a prima facie case of FMLA discrimination or retaliation, ModSpace has offered a legitimate, nondiscriminatory and non-retaliatory reason for terminating Sechler. As discussed above in the context of Sechler's ADA claim, ModSpace has presented evidence that it terminated Sechler for failing to take a drug and alcohol screen, in violation of his Return to Work Agreement. Thus, as with Sechler's ADA claim, the Court finds that ModSpace has put forward a legitimate, nondiscriminatory reason for Sechler's termination.

### c.  Pretext

Sechler urges that, "[a]s far as his termination, it is still unclear – and thus additional evidence of pretext – as to exactly what it was that Modspace rationalized as its reason for Sechler's termination." (Doc. No. 47 at 13.) However, as with his ADA claim, Sechler fails to present any evidence of pretext, and the Court thinks that ModSpace has expressed a consistent explanation for Sechler's termination. Sechler therefore has failed to meet his burden, and summary judgment must be granted in favor of ModSpace on Sechler's FMLA Discrimination/Retaliation Claim.

## IV.    CONCLUSION

As to Plaintiff's ADA discrimination and failure to accommodate claims, the Court finds that Defendant's motion must be **GRANTED**. As to Plaintiff's FMLA Entitlement Claim, the Court will defer its ruling until Plaintiff has had the opportunity to brief the question of the FMLA's applicability. As to Plaintiff's FMLA discrimination/retaliation claim, Defendant's motion must be **GRANTED**.

**IT IS SO ORDERED**.


**SIGNED** this the 18th day of April, 2012.



_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE